**Jose Rolando ESCOBAR RUIZ, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 83–7502.

United States Court of Appeals, Ninth Circuit.

March 25, 1987.

Marc Van Der Hout, San Francisco, Cal., for petitioner.

Marc C. Walters, Washington, D.C., for respondent.

Before SCHROEDER,* FLETCHER and REINHARDT, Circuit Judges.

## OPINION ON REHEARING

REINHARDT, Circuit Judge:

### I. INTRODUCTION

In *Escobar Ruiz v. INS*, 787 F.2d 1294 (9th Cir.1986), we decided that the former Equal Access to Justice Act (EAJA), codified at 5 U.S.C. § 504 (1982) and 28 U.S.C. § 2412 (1982), applies to immigration proceedings before the immigration judge and the Board of Immigration Appeals (BIA).[1] We rejected the argument that § 292 of the Immigration and Naturalization Act of 1952 (INA), 8 U.S.C. § 1362 (1982), precludes the extension of the EAJA to such proceedings. Section 292 provides that "the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, autho-

---

* Senior Circuit Judge Ben Duniway participated in our original decision. He died after the petition for rehearing was filed but before the panel took any action on it. Judge Schroeder was drawn by lot to serve in his place.

1. Congress originally enacted the EAJA as a three-year experiment. In 1985, the legislature reauthorized the Act, amending it and making it permanent. The two versions, however, are identical in all aspects relevant to this case.

rized to practice in such proceedings, as he shall choose."

In our previous opinion, we concluded that the parenthetical in section 292 means only that the government has no obligation to appoint and pay for the representation of aliens in deportation proceedings. Aliens have a right to representation but they must either retain counsel at their own expense or find voluntary representation. Section 292, we emphasized, says nothing about whether the government should or should not pay prevailing parties attorney's fees after the proceeding when the government's conduct is determined to have been unjustified. Finding no obstacle in section 292, we concluded that the EAJA covers immigration proceedings before the immigration judge and the BIA.[2]

The government now presents us with a petition for rehearing with suggestion for rehearing en banc. On this occasion, the government claims that deportation proceedings are not adversary adjudications within the meaning of 5 U.S.C. § 504 of the EAJA. The government brings to our attention subsection 504(a)(1), which states that fees and other expenses incurred by a prevailing party shall be awarded by agencies that conduct adversary adjudications. Subsection 504(b)(1)(C) provides that "adversary adjudication" means "an adjudication under section 554 [of the Administrative Procedures Act (APA)] in which the position of the United States is represented by counsel or otherwise ..." The government's central claim is that immigration proceedings before the immigration judge or the BIA are not conducted under section 554 and, therefore, subsection 504(a)(1) does not cover them.

## II. RAISING AN ISSUE FOR THE FIRST TIME IN A PETITION FOR REHEARING

The government raises the adversary adjudication argument for the first time in its petition for rehearing. It did not contend that the deportation proceeding was not an adversary proceeding when we confronted this case initially. Nor did it cite the statutory provisions it now says are controlling.

Courts of Appeals will ordinarily not consider for the first time on rehearing issues not presented by the parties in their briefs

---

**2.** *Tulalip Tribes of Washington v. F.E.R.C.*, 749 F.2d 1367 (9th Cir.1984), which the government cites to bolster its position, does not contribute much to the resolution of the immediate controversy. *Tulalip Tribes* establishes that section 317 of the Federal Power Act (FPA), 16 U.S.C. § 825p, carves an exception out of 28 U.S.C. § 2412(a), which generally provides for a judgment for costs for the prevailing party in civil actions against the government. Section 317 of the FPA declares: "No costs shall be assessed against the Commission in any judicial proceeding [ ...] under this chapter."

No legitimate analogy can be drawn between the language of section 317 of the FPA and that of section 292 of the INA. Section 317 of the FPA unequivocally orders that no costs be awarded against the Commission in proceedings under the chapter. The provision embodies a straightforward ban on cost-shifting. Section 292 of the INA, on the other hand, does not contain a direct prohibition on fee-shifting. The section says nothing about the validity or desirability of awarding attorney's fees to a prevailing party. The section only establishes that aliens in deportation hearings do not have a right to government-paid counsel.

The government also invokes *Abex Corp. v. Ski's Enterprises, Inc.*, 748 F.2d 513 (9th Cir. 1984). In *Abex*, an interpleader action, the court refused to order the payment of attorney's fees under the EAJA before the satisfaction of preexisting federal tax liens. In contrast to the present case, the *Abex* case involved a well-established public policy that allegedly stood in the way of granting attorney's fees. The court in *Abex* explained:

> The tax lien statutes establish a clear priority to interpleader funds in favor of the government. The passage of the EAJA, while abrogating governmental sovereign immunity against claims for attorney fees, does not dispense with the tax lien priority created under the tax lien statutes.

748 F.2d 513, 517. In the present case, awarding attorney's fees would not impinge upon a significant public policy policy—such as the policy of giving the government priority to interpleader funds.

*Abex* presents a clear conflict between statutes: the tax lien statutes and the EAJA. The court was forced to choose between them. The present case gives rise to no such conflict. As explained above, section 292 of the INA and the EAJA are entirely compatible. It is also important to keep in mind that the court in *Abex* did not decide that the conflict with the tax lien statute rendered the EAJA totally inapplicable. Instead, the court held that the EAJA applies only after the satisfaction of preexisting federal tax liens.

on appeal. *Partenweederei, MS Belgrano v. Weigel*, 313 F.2d 423, 425 (9th Cir.1962). A case must involve "extraordinary circumstances [to] justify our considering on petition for rehearing, issues which were not previously presented." *United States v. Sutherland*, 428 F.2d 1152, 1158 (5th Cir. 1970) (citation omitted). *See also Moore v. United States*, 598 F.2d 439, 441–42 (5th Cir.1979).[3] The case before us meets that exception to the general rule.

■ Our initial decision that Escobar Ruiz may be entitled to attorney's fees is the first by any court to consider the question whether the EAJA applies to immigration proceedings, and it is likely that numerous claims will be made in reliance on the opinion we issued. The new legal issue raised by the government goes to the heart of our decision. If the government's argument regarding the term "adversary adjudication" in section 504 is correct, then the EAJA does not apply to immigration proceedings and all attorney's fees claims arising out of such proceedings should be dismissed. Under these circumstances, permitting an improper interpretation of the EAJA to stand as the controlling precedent in our circuit would constitute a disservice to all parties concerned.

In addition, the government set forth its initial position in a response to a motion by petitioner for attorney's fees and not in a full brief on the merits. We therefore treat the government's failure to raise a central argument with more leniency than we ordinarily might. Finally, we are convinced that the government's failure to

present the issue at the proper time was inadvertent or negligent rather than willful. Unlike the court in *Partenweederei*, we have no reason to believe that the litigant "deliberately chose, for reasons of strategy," not to assert the claim at the appropriate time. 313 F.2d at 425. All in all, therefore, we have before us one of those "special situations [in which] a belatedly raised issue may be considered." *Moore v. United States*, 598 F.2d at 441.

## III. ADVERSARY ADJUDICATIONS FOR PURPOSES OF THE EAJA

Subsection 504(a)(1) of the EAJA requires that agencies award attorney's fees to prevailing parties in adversary adjudications unless the government's position was substantially justified or there are special circumstances that would make an award unjust. "Adversary adjudication," according to 5 U.S.C. § 504(b)(1)(C), means an adjudication (1) under section 554 of the APA (2) in which the position of the United States is represented by counsel or otherwise. A proceeding must meet these two requirements for the EAJA to apply. We consider the requirements in reverse order.

### A. *Representation of the Government's Position*

■ Deportation hearings before the immigration judge and the BIA almost always satisfy the second requirement. In hearings before the immigration judge, trial attorneys represent the position of the government.[4] Gordon and Rosenfield re-

---

**3.** In *United States v. Gordon*, 253 F.2d 177 (7th Cir.1958), for instance, the government argued for the first time in its petition for rehearing that defendant's challenge to the array or to the venire improperly raised the question of prejudice resulting from the distribution of a manual for jurors. The Seventh Circuit considered the belatedly-presented argument only because "to ignore the failure of the challenge to the venire to properly raise the handbook question would extend the office of such a challenge clearly beyond all proper limits and permit the addition of a ground not heretofore recognized by the law and for which there is no justifiable reason whatsoever." *Id.*, at 184. In *United States v. Byers*, 740 F.2d 1104 (D.C.Cir.1984), the District of Columbia Circuit decided that an appellate court may, on a petition for rehearing, consider

an issue where an intervening Supreme Court decision elevates that issue from a completely untenable to a plausible one. *Id.*, at 1115–16, n. 11. In *Peckham v. Board of Trustees of International Brotherhood and Allied Trades Union*, 724 F.2d 100 (10th Cir.1983), the Tenth Circuit considered a claim of lack of subject-matter jurisdiction raised for the first time in a petition for rehearing. The court's action was compelled by the well-established doctrine that the parties may not waive subject-matter jurisdiction and that, therefore, such a claim may be raised at any point in the litigation. *See* 2A Moore's Federal Practice ¶¶ 12.07[2.–1] & 12.23.

**4.** Gordon and Rosenfield point out that "investigators who are not lawyers sometimes represent the government as acting trial attorneys." 1A

port that "under current practice a trial attorney participates in virtually all current deportation hearings." 1A Gordon and Rosenfield, *Immigration Law and Procedure*, § 5.7c, at 5.87. The federal regulations require the immigration judge to request a trial attorney in all contested deportation proceedings and in any non-contested proceeding in which issues of law or fact remain. 8 C.F.R. §§ 242.16(b) & (c) (1986).[5]

When the BIA holds an oral argument, an official representative from the Office of General Counsel stationed at the Board—the appellate trial attorney—appears and presents arguments on the government's behalf. Appleman, *The Appellate Trial Attorney*, 20 IN Reporter 1, 2 (1971); 1 Gordon and Rosenfield, *Immigration Law and Procedure* § 1.10d(8), at 1–86, and § 1.10e(1), at 1–87. In most cases, however, the BIA determines the issue on the basis of briefs submitted by respective counsel.

In the present case, the government's position was represented by counsel both in the initial hearing before the immigration judge and on the appeal to the BIA.

B. *Adjudication Under Section 554*

1. *In General*

(a) *Introduction*

Section 504(b)(1)(C) of the EAJA also imposes the requirement that the proceeding constitute an adjudication under section 554 of the APA. The government argues

that this requirement means that unless an administrative proceeding is governed directly by section 554, the EAJA is inapplicable. The government cites *Marcello v. Bonds*, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955), to support its contention that the proceedings before the immigration judge and the BIA are not governed directly by 5 U.S.C. § 554. *Marcello* holds that the hearing provisions of the APA do not apply to deportation hearings. *Id.*, at 310, 75 S.Ct. at 761. The government reasons that because section 554 is a hearing provision, it does not apply directly to deportation proceedings and the first 504 requirement is, therefore, not met.

The government's argument finds considerable support in the literal language of the statute. Section 504 requires "an adjudication under section 554" which, at least at first blush, appears to mean an adjudication directly governed by section 554. Petitioner, however, contends that the EAJA only requires an adjudication as defined or described in section 554. An adjudication as defined in that section is, according to petitioner, one that is "required by statute to be determined on the record after an opportunity for an agency hearing." 5 U.S.C. § 554(a) (1982). The EAJA applies, petitioner urges, as long as a proceeding comes within that definition or description, even if the proceeding is not directly subject to section 554.

In support of his position, petitioner points to the Joint Explanatory Statement

---

Gordon and Rosenfield, *Immigration Law and Procedure*, § 5.7c, at 5–87. Representation of the government's position by non-lawyers, however, does not preclude EAJA coverage. Section 504 requires that "the position of the United States [be] represented by counsel *or otherwise.*" 5 U.S.C. § 504(b)(1)(C)(i) (1982) (emphasis supplied). The government may therefore present its position through a representative with no formal legal training. *See Chicago Central Hospital v. Heckler*, No. 84 C 10069 (N.D.Ill. Sept. 4, 1986) [Available on WESTLAW, DCTU database] (the phrase means that the EAJA applies in genuine adversary proceedings even if the position of government is not represented by counsel); Note, *The Equal Access to Justice Act: How to Recover Attorneys' Fees & Litigation Expenses from the United States Government*, 13 Tol.L.Rev., 149, 158 (1981).

**5.** The trial attorney, in addition, represents the position of the government in all cases "in which an unrepresented respondent is incompetent or under 16 years of age, and is not accompanied by a guardian, relative or friend." 8 C.F.R. § 242.9(b) (1986). The INS district director must also assign a trial attorney in cases "in which the Commissioner of Immigration and Nationalization approves the submission of nonrecord information under § 242.17(a)" and whenever the district director "deems such assignment necessary or advantageous." *Id. See generally* Williams, *The Trial Attorney—His Functions and Responsibilities*, 12 IN Reporter 47 (1964).

of the Committee of Conference on the EAJA. The statement declares unequivocally that the Act "defines adversary adjudication as an agency adjudication *defined* under the Administrative Procedures Act where the agency takes a position through representation by counsel or otherwise." H.R.Conf.Rep. No. 1434, 96th Cong., 2nd Sess., Item 17, at 23 (1980) *reprinted in* 1980 U.S.Code Cong. & Ad.News, 4953, 5003, at 5012 (emphasis supplied). Petitioner, with considerable persuasiveness, argues that such Congressional language clearly indicates that the EAJA only requires that proceedings fall within the definition or description incorporated in section 554 of the APA.

We cannot say with any certainty that the Act is subject to only one interpretation. An examination of the statute persuades us that petitioner's reading of its language is not implausible. Moreover, petitioner claims that the purpose and legislative history of the EAJA support his interpretation. The government, in response, simply invites us to accept its literal construction and to ignore the legislative policies and purposes that animate the Act. That invitation violates the rule recently enunciated in *Cardoza-Fonseca. See INS v. Cardoza-Fonseca,* —— U.S. ——, ——, n. 12, 107 S.Ct. 1207, 1213, n. 12, 94 L.Ed.2d 434, 448 n. 12 (1987). In any event, even under the pre-*Cardoza-Fonseca* view (as identified in Justice Scalia's concurrence, *id.,* at——, 107 S.Ct. at 1223 (Scalia, J., concurring in the judgment)) we would not find the government's construction sufficiently compelling to justify putting aside all extrinsic aides to statutory interpretation.

Where there is more than one plausible interpretation we "examine the legislative history and surrounding circumstances in order to construe the Act properly." *Catawba Indian Tribe of S.C. v. State of South Carolina,* 718 F.2d 1291, 1296 (4th Cir.1983). *See, e.g., Religious Technology Center v. Wollersheim,* 796 F.2d 1076, 1084 (9th Cir.1986). We will, consequently, turn to the EAJA's purpose and legislative history, the Commentary to the Model Rules for Agency Implementation, and the EAJA's 1985 reauthorization for guidance

as to the meaning of the concept of "an adjudication under section 554."

**(b)** *The Purpose and Legislative History of the EAJA*

The EAJA grew out of a concern for the unequal position of the individual vis à vis an insensitive and ever-expanding governmental bureaucracy. The House Report expresses concern about the fact that, "at the present time, the government with its greater resources and expertise can in effect coerce compliance with its position." H.R.Rep. No. 1418, 96th Cong., 2nd Sess., Statement, at 10, *reprinted in* 1980 U.S. Code Cong. & Admin.News 4984, 4988.

Through the EAJA, Congress intended to provide individuals with additional means for protecting fundamental rights. But Congress also envisioned the Act as an instrument to enforce and perfect public policy. The House Report elaborates:

> The bill rests on the premise that a party who chooses to litigate an issue against the Government is not only representing his or her own vested interest but is also refining and formulating public policy. An adjudication or civil action provides a concrete, adversarial test of Government regulation and thereby insures the legitimacy and fairness of the law.

H.R.Rep. No. 1418, *supra,* at 10, U.S.Code Cong. & Admin.News 1980 at 4988. The ventilation of well-founded claims, the framers of the Act believed, would force the authorities to interpret and apply the law correctly.

The EAJA, thus, seeks to modify the incentive structure underlying individual challenges of the governmental administrative apparatus. Under the act, courts and administrative agencies may award prevailing parties attorney's fees, expert witness fees and other expenses against the United States. Individuals with strong claims against unreasonable governmental action—*i.e.,* with a high probability of prevailing—end up, at least in theory, with lower expected litigation costs. Such individuals

will supposedly have a greater incentive to stand firm on their rights and thereby advance public policy.

The House Report on the bill explains that the decision to limit the coverage of section 504(a)(1) to adversary adjudications under section 554 of the APA

> reflects a desire to limit the award of fees to situations where participants have a concrete interest at stake but nevertheless may be deterred from asserting or defending that interest because of the time and expense involved in pursuing administrative remedies. In these situations, in order to insure that individuals will actively seek to protect their rights vis-a-vis the government, they must have the opportunity to recover the costs of litigating. An administrative remedy in these circumstances cannot be fairly effective unless a prevailing party is made whole.

H.Rep. No. 1418, *supra,* at 14, U.S.Code Cong. & Admin.News 1980, at 4993. With the reference to adjudications under section 554, hence, the framers of the EAJA intended to identify a time-consuming and expensive set of proceedings which tend to discourage many legitimate claimants. It is consistent with that purpose to have the EAJA apply only to proceedings of the type referred to in section 554. For, *ceteris paribus,* adjudications determined on the record after an agency hearing require a greater investment of time and money than other proceedings.

On the other hand, the fact that a proceeding is technically conducted directly under section 554 does not make the adjudication any more or less burdensome on individuals with valid claims than other adjudications that are conducted in the same manner. Limiting the EAJA's coverage to adjudications directly subject to section 554, consequently, would be less consonant with the Congressional intent than including all proceedings of the type described in that section.[6]

### (c) *The Commentary to the Model Rules for the Agency Implementation of the EAJA*

Strong support for the conclusion that the term "an adjudication under section 554" includes adjudications of the type referred to in section 554 may also be found in the Statement accompanying the Model Rules for the Implementation of the EAJA. In the Statement, the Office of the Chairman of the Administrative Conference of the United States (ACUS), advises agencies to take "a broad interpretation of the reference to adjudications 'under section 554' largely to avoid protracted debate about whether particular proceedings fall within its ambit." Office of the Chairman. Administrative Conference of the United States, Equal Access to Justice Act: Agency Implementation, 46 Fed.Reg. 32,900, 32,901 (June 25, 1981). The Statement adds, "considering the purpose of the Equal Access to Justice Act, questions of its coverage should turn on substance—the fact that the party has endured the burden and expense of a formal hearing—rather than technicalities." *Id.* We give considerable deference to this admonition since the EAJA itself directs agencies to consult with the Chairman of the ACUS before establishing uniform procedures to implement the Act. 5 U.S.C. § 504(c)(1) (1982). *See* Robertson and Fowler, *Recovering Attorneys' Fees from the Government under the Equal Access to Justice Act,* 56 Tul.L.Rev. 903, 915 (1982).

The Office of the Chairman of the ACUS insists on a broad interpretation of the expression "adjudication under section 554." In addition, the ACUS specifically declares that questions of the EAJA's coverage should turn on "the fact that the party has endured the burden and expense of a formal hearing." Thus, according to the agency charged with assisting in the

---

**6.** We note that Congress changed the words "an adjudication subject to section 554", which appeared in the Senate bill that later became the EAJA (S. 265), to "an adjudication under section 554." This change suggests that Congress may have decided that proceedings need· not be directly subject to section 554. We do not assume that Congress altered the language without intending to change the meaning.

uniform implementation of the Act,[7] whether a proceeding constitutes an adjudication under section 554, depends on whether it is, in fact, determined on the record after an opportunity for an agency hearing and not on the "technicality" of whether a proceeding is directly subject to section 554.

(d) *The 1985 Reauthorization of the EAJA*

The House Report for the 1985 reauthorization of the EAJA issued by the Judiciary Committee also supports a broad construction of the term "adjudication under section 554." H.R.Rep. No. 120, 99th Cong., 1st Sess., *reprinted in* 1985 U.S.Code Cong. & Admin.News 132. The House Report repeatedly chastises the courts for our restrictive interpretation of the EAJA. The Judiciary Committee instructs us to take the "expansive view" of the Act and apply "the broader meaning." *Id.*, at 19, 9.

The Report, for instance, complains that "[s]ome courts have construed the 'position of the United States' which must be 'substantially justified' in a narrow fashion which has helped the Federal Government escape liability for awards." *Id.*, at 9, U.S. Code Cong. & Admin.News 1985, p. 137. The new version of the EAJA, according to the Report, clarifies that the 'position of the United States' is "not limited to the government's litigation position but [includes] the action—including agency action—which [leads] to the litigation." *Id.*

The House Report also criticizes courts that have taken "substantial justification" to mean merely reasonable. "Especially puzzling," it declares, "have been statements by some courts that an administrative decision may be substantially justified under the Act even if it must be reversed because it was arbitrary and capricious or was not supported by substantial evidence." *Id.*, at 9, *reprinted in* 1985 U.S.Code Cong. & Admin.News 132, 138 (footnote omitted). The Report emphatically rejects both such

approaches and establishes that "substantial justification" means more than reasonableness and should be determined on a case by case basis.

Further on in the Report, the Judiciary Committee censures our holding in *Auke Bay Concerned Citizen's Advisory Council v. March*, 755 F.2d 717 (9th Cir.1985), *superseded*, 779 F.2d 1391 (9th Cir.1986), that parties may not file fee petitions before final judgment. H.R.Rep. No. 120, *supra*, at 18, n. 26. In the same footnote, the Report rejects the requirement that settlements produce a judicial order for the EAJA to operate. The Committee rejects both interpretations as "overly technical." It warns against using the Act "as a trap for the unwary resulting in the unwarranted denial of fees." *Id.* Making a procrustean technical requirement out of section 554 of the APA would, in fact, be tantamount to using the EAJA in that manner.

One of the comments on the original EAJA by the House Judiciary Committee sheds considerable light on the understanding of Congress regarding the proper interpretation of "adversary adjudications." The Report discusses the applicability of the EAJA to Social Security Administration hearings at the administrative level. The Judiciary Committee notes that the EAJA covers such hearings. "While, generally, Social Security administrative hearings remain outside the scope of [section 504], those in which the Secretary [of Health and Human Services] is represented are covered by the Act." *Id.*, at 10, U.S. Code Cong. & Admin.News 1985, p. 138.

What is important about the Judiciary Committee's comment is that the committee reached the conclusion that the EAJA applies to Social Security proceedings in which the government is represented by counsel even though the question whether section 554 of the APA directly governs those proceedings remains very much in

---

**7.** The ACUS issued the Model Rules for the Implementation of the EAJA pursuant to the Act's mandate for the establishment of uniform procedures. In the commentary to the rules, the ACUS noted: "While identical rules government-wide are a practical impossibility, we ex-

pect agencies, in pursuit of this statutory objective, to give serious consideration to the Model rules, as well as to the views of this office on the rules proposed by particular agencies." Equal Access to Justice Act: Agency Implementation, *supra*, at 32,900.

doubt. The Committee was certainly aware that in *Richardson v. Perales*, the Supreme Court expressly refused to "decide whether the APA has general application to social security disability claims." 402 U.S. 389, 409, 91 S.Ct. 1420, 1431, 28 L.Ed.2d 842 (1971). Apparently the Committee did not consider that the uncertainty as to the direct applicability of the APA to Social Security hearings was relevant to whether the EAJA applied to such hearings. Rather, it must have been concerned only with the fact that the hearings are of the type defined in section 554. According to the House Report, adversary Social Security hearings fall under the EAJA; they do so irrespective of whether such proceedings are technically or directly subject to section 554. By the same token, the EAJA applies to adversary deportation proceedings whether or not section 554 applies technically or directly to such proceedings.

(e) *Summation*

■ The words "an adjudication under section 554", thus, constitute shorthand for the expression "an adjudication determined, by statute, on the record and after an opportunity for an agency hearing." Subsection 504(b)(1)(C) of the EAJA merely includes these features—determination on the record and opportunity for an agency hearing—along with another—representation of the position of the United States—in its definition of an adversary adjudication. Consistent with the interpretation we adopt, the Eighth Circuit has stated: "An 'adversary adjudication' is defined as one which is 'determined on the record after an opportunity for an agency hearing,' 5 U.S.C. § 554, where 'the position of government is represented by counsel,' 5 U.S.C. § 504(b)(1)(C)." *Cornella v. Schweiker*, 728 F.2d 978, 988 (8th Cir.1984).

Our analysis has taken us through the purpose and legislative history of the EAJA, the Commentary to the Model Rules for Agency Implementation of the EAJA, and the 1985 reauthorization of the Act. Our examination of all these elements compels us to read the phrase "an adjudication under section 554" broadly to include all adjudications of the type referred to in that section. Such an interpretation is far more consistent with the objectives of the EAJA than the highly restrictive reading proposed by the government.

2. *As Applied to Deportation Proceedings*

Deportation proceedings clearly are adjudications of the type referred to in section 554. Section 242 of the INA establishes that a "[d]etermination of deportability in any case shall be made only upon a record made in a proceeding before a special inquiry officer, at which the alien shall have a reasonable opportunity to be present." 8 U.S.C. § 1252(b) (1982). Deportation proceedings, hence, meet the standard for an "adjudication" set forth in section 554: The enabling statute requires a determination on the record and a prior opportunity for an agency hearing.

Moreover, other procedures and principles that govern deportation proceedings parallel the incidents of agency adjudication dictated by section 554. Both the INA and section 554 require notice of the time, place, and nature of the hearings. *Compare* 8 U.S.C. § 1252(b)(1) *with* 5 U.S.C. § 554(b)(1). Similar provisions for an opportunity to submit facts, arguments, offers of settlement, and other proposals set forth in section 554, exist under the INA. *Compare* 8 U.S.C. § 1252(b) *with* C.F.R. 242.16(a)-(d).

Deportation proceedings, hence, are not only of the type referred to in subsection 554(a) but are governed by procedural requirements that are similar to those governing proceedings directly subject to that section. The similarity is not surprising since, as the Supreme Court explained in *Marcello*, "the framework of the [INA] indicates clearly that the Administrative Procedure Act was being used as a model." 349 U.S. at 309, 75 S.Ct. at 761. The *Marcello* court considered "all of the differences in the hearing provisions of the two Acts." *Id.*, at 306, 75 S.Ct. at 760. Some of the provisions of the INA, naturally, deal with matters peculiar to deportation proceedings and, consequently, have

no direct analogues in the APA. Otherwise, the Supreme Court found significant differences only in the statutes' definitions of the functions of the hearing officer.[8] However, amendments to immigration regulations have virtually eliminated the distinctions between the APA's and the INA's respective definitions of the role of that officer.[9] Thus, the hearing provisions of the INA and those of the APA are currently fundamentally identical.

■ Deportation hearings, in fact, are quintessentially the type of proceedings that the framers of the EAJA were concerned about. Aliens usually find themselves in an even more difficult position than other individuals when confronted by the overpowering arm of the state. Aliens' lack of familiarity with the English language and with the details of our legal system reduces significantly their ability to resist illegitimate official coercion.

It would be wholly inconsistent with the purposes of the EAJA to exclude proceedings, such as immigration proceedings, in which individuals have fundamental interests at stake that the government is attacking in a complex and adversarial hearing. The complexity of deportation proceedings goes beyond the fact that they embody the features listed in section 554. Both sides present evidence and interrogate, examine, and cross-examine the witnesses. 8 U.S.C.

§ 1252(b) (1982). The immigration judge is required to base the decision of deportability on reasonable, substantial, and probative evidence. 8 U.S.C. § 1252(b)(4) . (1982). And the proceedings involve the intricate laws of the INA, which resemble "King Minos's labyrinth in ancient Crete." *Lok v. INS*, 548 F.2d 37, 38 (2nd Cir.1977).

Deportation, hence, involves a substantially complex proceeding. For aliens to secure their rights it is often necessary for them to have counsel. The facts of the controversy before us provide a case in point. At the deportation proceeding before the immigration judge, Escobar Ruiz appeared *pro se*. He admitted the allegations in the order to show cause and the immigration judge found him deportable. Escobar Ruiz did not request asylum.

Escobar Ruiz decided to press for his rights only after he obtained assistance of current *pro bono* counsel. Through his counsel, he filed a notice of appeal with the BIA and a motion to reopen in which he sought asylum and prohibition against deportation. Though the INS initially succeeded in convincing the BIA to deny the motion to reopen, the government subsequently reversed its position after this court, at the time of oral argument, "expressed strong concern regarding the INS's conduct through the proceedings below." *Escobar Ruiz v. INS*, 787 F.2d 1294,

---

**8.** The Supreme Court noted that the INA allowed the special inquiry officers (presently known as immigration judges) to take the dual role of prosecutor and hearing officer. Section 7(b) of the APA, currently § 556, on the other hand "makes no mention of functions stemming from the special inquiry officer's dual role as prosecutor and judge." 349 U.S. at 307, 75 S.Ct. at 760. Moreover, special inquiry officers, the court underscored, were "subject to the supervision of district directors of the immigration districts to which they were assigned, as well as higher service officials, all with enforcement responsibilities of the type proscribed by § 5(c) of the Administrative Procedure Act." *Id.*, at 306, 75 S.Ct. at 759.

**9.** As we mentioned before, now in all contested deportation proceedings, as well as in other special situations, the immigration judge requests a trial attorney to take over the prosecuting functions. The immigration judge undertakes prosecuting functions only if respondent

concedes deportability, no issue of law or fact remains, and the case does not present any of the special circumstances in which a trial attorney is required. For purposes of the EAJA, we are only concerned with hearings in which trial attorneys are present and, therefore, the immigration judge does not perform a prosecutorial role.

In addition, since 1956 immigration judges (formerly, inquiry officers) have been insulated from control or supervision by enforcement or investigative officers. 1A Gordon and Rosenfield, *supra*, § 5.7a(3), at 5–79. Subsequently they were removed altogether from the enforcement apparatus and are presently supervised only by an adjudicating body. The Attorney General has enacted regulations separating the Immigration Court and the BIA from the INS by creating a new entity, the Executive Office for Immigration Review. *See* 48 Fed.Reg. 8038–8040 (Feb. 25, 1983), 8 C.F.R. 1.1, 2.1, 3.0, 3.1, 3.3, 3.8, 3.9, 3.10, 100.2. 1A Gordon and Rosenfield, *supra*, § 5.7a(4), at 5–80 (1986 Supp.).

1296 (9th Cir.1986). The BIA promptly re-opened the proceedings.

By enacting the EAJA, Congress sought to provide relief for individuals in precisely the situation that aliens often find themselves in during deportation hearings: overpowered and overwhelmed by the state. Making the EAJA applicable in deportation hearings cannot but advance the purposes underlying the Act. As the leading treatise on immigration law explains, "in the absence of any indication of a desire by Congress to exclude INS proceedings from the benefits of the EAJA, the [position that the EAJA does not apply to deportation hearings] seems questionable, particularly since such proceedings seem to fit precisely within the language and purpose of the EAJA." 1 Gordon and Rosenfeld, *Immigration Law and Procedure* § 1.24Ab(2), at 1–52.12.

## IV. CONCLUSION

The new argument presented by the government falls within an exception to the rule precluding the raising of arguments for the first time on a petition for rehearing. Having considered the government's additional argument, we, nonetheless, reaffirm our initial decision. Our conclusion that subsection 504(a) of the EAJA applies to deportation proceedings remains unchanged. Such proceedings meet the two requirements for adversary adjudications under the Act. First, the position of the United States is represented by counsel. Second, deportation proceedings, by statute, are determined on the record after an opportunity for an agency hearing and, consequently, constitute adjudications under section 554 of the APA. The petition for rehearing is

DENIED.